GREGORY KAFOURY, OSB. No. 741663
kafoury@kafourymcdougal.com
Kafoury & McDougal
411 SW Second Ave., Suite 200
Portland, OR 97204
Phone: (503) 224-2647
Fax: (503) 224-2673
Attorney for Plaintiffs

ROBERTA D. LIEBENBERG, PA No. 31738 (*pro hac vice* motion forthcoming)
rliebenberg@finekaplan.com
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
Associate Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| MARY CARR and JAN G. WYERS, individually and on behalf of all others similarly situated, | Case No: |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| GENERAL MOTORS LLC, | |
| Defendant. | |

Plaintiffs Mary Carr and Jan G. Wyers ("Plaintiffs") bring this class action lawsuit against

General Motors LLC ("GM" or "Defendant") on behalf of themselves and all other similarly

situated persons who purchased or leased 2017-2019 model year Chevrolet Bolt all-electric

COMPLAINT                              1

vehicles that GM has recalled or will recall due to the potential for fire in the high-voltage lithium-ion battery pack that propels the vehicle (hereafter "Chevy Bolt" or "Class Vehicles"). As described in more detail below, Plaintiffs seek economic damages and other appropriate relief because the Class Vehicles are defective and were deceptively marketed to consumers.

## INTRODUCTION

1.     The Chevrolet Bolt is a plug-in, all-electric vehicle powered by a high-voltage lithium-ion battery pack ("Battery").[1]

2.     Electric vehicles like the Bolt have important environmental and financial advantages over conventional vehicles with internal combustion engines. In general, the cost of electricity to charge an electric vehicle ("EV") is considerably less than would be the cost of fueling with gasoline or diesel, and vehicle maintenance costs typically are lower as well. Significantly, all-electric vehicles do not produce any of the tailpipe emissions -- such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, or carbon dioxide and other greenhouse gases – that are produced by vehicles with internal combustion engines.[2]  The total lack of tailpipe emissions means that EVs help improve air quality, improve public health, and reduce the overall ecological damage caused by driving personal vehicles. (*Id.*)

---

[1] The high-voltage battery pack "spans the entire floor" of the vehicle, "from the front foot well to back of the rear seat." https://media.chevrolet.com/media/us/en/chevrolet/news.detail.html/content/Pages/news/us/en/2016/Jan/naias/chevy/0111-bolt-du.html (last visited Feb. 24, 2021). The Bolt also has a 12-volt "accessory" battery under the hood that powers the vehicle's computer system, lights, infotainment system, and other components. GM's recall is focused on the Bolt's high voltage lithium-ion battery pack, not the accessory battery.
[2] https://www.energy.gov/eere/electricvehicles/reducing-pollution-electric-vehicles (last visited Feb. 24, 2021).

This benefit is especially significant in Oregon and other states in which most electricity is generated from sources other than coal-fired plants.[3]

3.     Electric vehicles generally do not travel as far on a full electrical charge as a gasoline- or diesel-powered car would travel on a full tank of fuel. In addition, it takes much longer to charge an EV's battery than to fill a gas tank. For example, the 2017, 2018, and 2019 Bolt EV Owner's Manuals state that charging the Battery from a standard 120-volt AC electrical outlet for an hour would yield about 4 miles of driving range. If the Battery were completely depleted, it would take about 50 hours to fully recharge. For this reason, many Bolt owners install "Level Two" 240-volt charging stations at their residences. Although faster, 240-volt chargers still provide only about 25 miles of driving range per hour of charging.[4] Necessarily, then, the distance one can drive on a fully-charged battery without stopping to recharge the battery (the "battery range" or "range") is one of the most critical factors to consider in purchasing any all-electric vehicle.

4.     GM was well aware of the importance that consumers placed on an EV's battery range and marketed the Bolt accordingly. It touted the Chevy Bolt's Battery as being "where it all starts," and advertised an energy capacity of 60 kWh, which GM said allowed drivers to travel an

_____

[3] *See* https://afdc.energy.gov/vehicles/electric_emissions.html (state-by-state calculator showing that charging an all-electric vehicle in Oregon produces less than 17% of the carbon dioxide equivalent of that produced by gasoline-powered vehicles) (last visited Feb. 24, 2021).

[4] The only way to charge the Bolt more quickly is to find a "DC Fast Charging" station.  These chargers are not available for home installation (https://www.chevrolet.com/electric/living-electric, last visited Feb. 24, 2021) and are nowhere near as prevalent as gas stations. One might need to wait an hour or more to use a particular fast charger if another EV is already charging there, and the wait could be hours if the other driver does not retrieve the car as soon as it is charged.

EPA-estimated 238 miles on a single full charge.[5] An example of one such advertisement touting the Bolt's battery capabilities appears below.



5.      The Bolt's stated range impressed consumers and automotive reviewers. The Chevy Bolt received the prestigious 2017 Motor Trend Car of the Year accolade as being a "game changer" due in part to the 238 miles the "EPA has certified the [Chevy] Bolt EV will travel on a full charge."[6]  It was similarly awarded titles for the 2017 North American Car of the Year,[7] and 2017 Green Car of the Year.[8] *Green Car Reports* stated that the "most important thing about the Bolt EV" was "how far you can go on a single charge," noting that the 2017 Bolt offered "the range of a Tesla, for roughly half the price."[9]

---

[5] https://www.dublinchevrolet.com/Chevrolet-Bolt-EV (last visited Feb. 24, 2021); *see also*, https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Feb. 24, 2021).
[6] https://www.motortrend.com/news/chevrolet-bolt-ev-2017-car-of-the-year/ (last visited Feb. 24, 2021).
[7] https://northamericancaroftheyear.org/chevrolet-bolt-chrysler-pacifica-honda-ridgeline-named-2017-north-american-car-truck-and-utility-vehicle-of-the-year/ (last visited Feb. 24, 2021).
[8] https://www.autoblog.com/2016/11/17/chevy-bolt-wins-2017-green-car-of-the-year/ (last visited Feb. 24, 2021).
[9] https://www.hybridcars.com/2017-chevy-bolts-trophy-case-is-filling-up (last visited Feb. 24, 2021); https://www.greencarreports.com/news/1106584_chevrolet-bolt-ev-green-car-reports-best-car-to-buy-2017#:~:text=The%20most%20important%20thing%20about,much%20faster%20than%20other%20uses (last visited Feb. 24, 2021).

COMPLAINT                                4

6.     Unfortunately for consumers like Plaintiffs, however, the Class Vehicles have a serious defect that significantly reduces their range:  when the Batteries are fully or almost fully charged, they pose a risk of fire[10] (the "Battery Defect"). The National Highway Traffic Safety Administration ("NHTSA") warns that the "affected vehicles' [battery] cell packs have the potential to smoke and ignite internally, which could spread to the rest of the vehicle and cause a structure fire if parked inside a garage or near a house" and that the vehicles "can catch fire even if they are turned off, parked, and disconnected from a charging unit."[11]

7.     Instead of replacing the defective Battery, GM is offering only an unsatisfactory "interim remedy" to reduce the risk of fire:  dealer installation of "a software update that will limit the charge [for all Class Vehicles] to 90%."[12]  In the alternative, depending on the model year of their Bolt, owners and lessees can activate the car's "Hill Top Reserve" option or "Target Charge Level" feature to limit charging capacity to 90 percent.[13] All of these options significantly reduce the Bolt's range.

8.     GM knew but failed to inform prospective owners and lessees about this dangerous Battery Defect and that they would be forced to decide between risking a potentially fatal car fire or losing significant range. To the contrary, GM previously *encouraged* Bolt owners and lessees to fully charge the Bolt Battery.

9.     GM's conduct has placed Bolt purchasers and lessees in an untenable position: either fully charge the Battery to be able to use the vehicle's stated 238-mile driving range but run

---

[10] https://my.chevrolet.com/how-to-support/safety/boltevrecall (last visited Feb. 24, 2021).
[11] https://www.nhtsa.gov/press-releases/consumer-alert-chevrolet-bolt-recall-fire-risk#:~:text=GM%20has%20issued%20a%20recall,the%20back%20seat's%20bottom%20cushion.&text=NHTSA%20has%20confirmed%20five%20known,vehicle%20and%20ignited%20a%20home (last visited Feb.24, 2021).
[12] https://my.chevrolet.com/how-to-support/safety/boltevrecall (last visited Feb. 24, 2021).
[13] *Id.*

the risk of a serious fire, or lessen the risk of fire by acquiescing to GM's recommended "fix" and lose at least 10% of the range they expected to have. For Plaintiffs and other customers, the reduced range means that they can no longer drive their Bolt to places they once reached on a single charge without spending time finding a charging station and recharging the Battery during the trip. They may have to rent or borrow a non-electric car for trips that exceed the reduced range, thereby foregoing the environmental, monetary, and other advantages of driving an EV.

10.     The actual distance that Plaintiffs and other Class Members can comfortably drive on a single charge is even less than 90% of the 238-mile stated range of the Bolt because weather, detours, traffic, and other conditions can cause the Battery to be depleted earlier than expected. If the Battery is fully depleted, the car cannot be driven until it is plugged in and recharged long enough to complete a trip.

11.     Plaintiffs bring this class action lawsuit on behalf of themselves and a class of similarly situated consumers who have purchased or leased one or more of the Class Vehicles (the "Class" or "Class Members").

12.     Plaintiffs and the Class seek redress for GM's fraudulent conduct, its breaches of express and implied warranties, unjust enrichment, and GM's violations of the Oregon Unlawful Trade Practices Act and the Magnuson-Moss Warranty Act.

13.     Plaintiffs and the Class seek actual damages, restitution, and equitable relief, as well as statutorily-permitted reasonable attorneys' fees and costs of suit and pre- and post-judgment interest. Plaintiffs and the Class also seek punitive damages as a result of GM knowingly introducing defective Class Vehicles into the marketplace and defrauding consumers across the nation.

## PARTIES

**A.     Plaintiffs**

14.     Plaintiffs Mary Carr and Jan Wyers are adult individuals who reside in Portland, Oregon. On or about November 27, 2018, Plaintiffs purchased a 2019 Chevrolet Bolt from a dealership in Beaverton, Oregon, an authorized GM retailer.

**B.     Defendant General Motors**

15.     Defendant GM is a limited liability company organized under Delaware law with its principal office located at 300 Renaissance Center, Detroit, Michigan 48265. Defendant designs, tests, markets, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including but not limited to Chevrolet, Buick, GMC, and Cadillac, in this district and throughout the United States.

## JURISDICTION

16.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) at least one Class Member is a citizen of a different state than Defendant. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendant because it is present, licensed to conduct business, and does conduct business regularly in this District; and Defendant has sufficient contacts with this District.

## VENUE

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business in this District, including sales and advertising, and Defendant is

COMPLAINT                                          7

subject to personal jurisdiction in this District. Additionally, a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this District.

**FACTUAL AVERMENTS**

**A.**      **GM Markets and Sells the Chevrolet Bolt**

19.      The Chevy Bolt is a front-motor, five-door, all-electric, plug-in hatchback. A picture of the 2017 ChevyBolt is below:



20.      An all-electric vehicle's usefulness depends in large part on its range: the distance the vehicle can travel before its battery must be recharged. This is because there are far fewer charging stations than gas stations in the United States, and because it takes much longer to charge an EV's battery than to put gasoline in a car. Electric car buyers necessarily rely on the manufacturer's representations about an electric vehicle's range.

21.     GM's national advertising campaigns marketed the Bolt's "impressive EPA-estimated 238 miles of range" as one of its main selling points. GM touted the Battery as where "[i]t all starts" and as making it possible to get drivers to the places they need to go.[14]

22.     GM consistently represented to customers -- including in "Chevrolet Bolt EV Specifications" published for the 2017, 2018, and 2019 model year Bolt EVs[15] and in Chevrolet Bolt EV Catalogs[16] -- that the Class Vehicles had an EPA-estimated range of 238 miles.

**B.      The Chevrolet Bolt Suffers from a Battery Defect that Leads to Fire Risk When the Battery Is Fully Charged**

23.     The lithium-ion Batteries in the Class Vehicles were produced at an LG Chem facility in Ochang, South Korea.

24.     Lithium-ion batteries, such as those used in the Chevrolet Bolt, are a key component of electric vehicles due to their high specific energy, high power, and long lifecycle.[17]

25.     Drivers rely on the capacity and safety of the lithium-ion batteries that power the Chevrolet Bolt.

---

[14]   https://web.archive.org/web/20171011012928/http:/www.chevrolet.com/bolt-ev-electric-vehicle (last visited Feb. 24, 2021).

[15]   https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.tab1.html; https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.tab1.html; https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.tab1.html (last visited Feb. 24, 2021).

[16]   https://s3.amazonaws.com/fzautomotive/dealers/2017-bolt.pdf; https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/shopping-tools/download-catalog/02-pdf/2018-chevrolet-bolt-ev-catalog.pdf; https://s3.amazonaws.com/fzautomotive/dealers/2017-bolt.pdf (last visited Feb. 24, 2021).

[17]   https://afdc.energy.gov/vehicles/electric_batteries.html#:~:text=Lithium-Ion%20Batteries,-Lithium-ion%20batteries&text=They%20also%20have%20a%20high,%2C%20and%20low%20self-discharge.&text=Most%20of%20today's%20PHEVs%20and,that%20of%20consumer%20electronics%20batteries (last visited Feb. 24, 2021).

26.     Unbeknownst to Plaintiffs and the Class when they purchased or leased their Bolts, however, the Class Vehicles have a defect that renders the Battery susceptible to catching fire when fully charged. Rather than inform consumers about the existence of this Battery Defect at the time of purchase, GM actually encouraged Chevy Bolt owners to "top off your battery as much or as little as you like."[18]

27.     Indeed, in a Facebook Q&A in October of 2019, Chevy Bolt EV Expert Adam Piper, Energy Performance Engineer at GM, dispelled concerns that Chevy Bolt EV owners should avoid charging their batteries to 100%, stating: "We engineered the battery system so that you can charge to 100% and maximize range. Do whatever is best for your personal circumstances. If you want maximum range, charge to 100%."[19]

28.     Despite these assurances, on November 13, 2020, GM announced that it was "recalling all 2017-2018 and certain 2019 Chevrolet Bolt EV vehicles" because the "high voltage battery could catch fire when charged to full or nearly full capacity."[20] The affected vehicles— over 50,000 of which are in the United States—are equipped with design-level N2.1 Batteries produced at LG Chem's Ochang, Korea plant. Through its own investigation, GM concluded that the Battery pack posed a risk of fire when charged to full, or very close to full, capacity.

29.     By definition, all Class Vehicles are affected by the recall. But not all Bolts are necessarily affected by the Battery Defect. GM has not recalled certain model year 2019 Bolts whose Batteries were produced in different LG facility. It also has not recalled any model year

---

[18] https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Feb. 24, 2021).

[19] *See* Steve Birkett, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*, TORQUE NEWS (Oct. 31, 2019), https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last visited Feb. 24, 2021).

[20] https://www.nhtsa.gov/vehicle/2019/CHEVROLET/BOLT%252520EV/5%252520HB/FWD#recalls (last visited Feb. 24, 2021).

COMPLAINT                                        10

2020 Chevrolet Bolt EVs, reporting that the 2020 model "uses a different [battery-]cell design than the vehicles affected by this recall."[21]

30.    Although GM now has Batteries that have not manifested the Battery Defect, it is not recalling Class Vehicles to replace the dangerous Batteries. Instead, GM is recalling Class Vehicles to reprogram the hybrid propulsion system control module to reduce the Battery's charge capacity by 10%. This software change automatically reduces the Battery's range to approximately 214 miles or less.

31.    GM recommends that until the dealer-installed software update is completed, Class Vehicle owners and lessees should engage the "Hill Top Reserve" or "Target Charge" feature on their Chevy Bolt to limit the Batteries' charge to a maximum of 90%. GM also advised owners and lessees of Class Vehicles not to park their cars in their garages or carports or near other structures until the charging level of their vehicle is limited as recommended.

32.    Class Vehicle owners are thus faced with a Hobson's choice: either do nothing and risk a potentially fatal car fire, or significantly diminish the charging capacity of the Battery, thereby reducing their driving range by at least 10% and probably more.

33.    GM has sold and leased, and continues to sell and lease, Class Vehicles with the knowledge that they contain defective and potentially dangerous Batteries.

**C.    GM's Knowledge of and Insufficient Response to Battery Issues**

34.    GM has been aware of Battery-related problems in the Bolt since at least late 2016.

35.    In December 2016, shortly after launching the Bolt, GM issued Service Bulletin PIC6239 informing dealers of a "Bolt EV (BEV2) High Voltage Battery Exchange and internal

---

[21] Frequently Asked Questions, Bolt EV Recall, https://my.chevrolet.com/how-to-support/safety/boltevrecall (last visited Feb. 24, 2021).

Parts Process" that might require them to replace the Bolt's "Rechargeable Energy Storage System (RESS)" (*i.e.*, the Battery) or certain related components.[22]

36.     In November 2017, GM issued a revised "Customer Satisfaction Program" bulletin warning that "Certain 2017 model year Chevrolet Bolt EV vehicles may have a condition in which the cells within the battery pack have low voltage. This condition is related to the state of charge of the cell group. Eventually, the difference in the state of charge of the cell groups (average vs. minimum) may exceed a threshold," requiring replacement of the "high voltage battery pack."[23]

37.     A display screen in the Bolt informs drivers of the vehicle's estimated driving range on its current charge and warns them when the Battery is at an especially low state of charge. Drivers rely on this information to calculate how far they can drive without having to recharge, and when they need to charge immediately to avoid losing propulsion. If propulsion is completely lost, the car must be towed to a charging station or electric outlet and recharged. One cannot merely add a gallon of gas to a tank, or jump start the Battery.

38.     In March or April 2018, GM instructed certain owners of the 2017 Chevrolet Bolt to get a dealer-installed software update because otherwise the vehicle "may experience 'loss of propulsion' and stop suddenly without warning due to low charge despite the battery indicator showing charge."[24]

39.     On or about May 11, 2018, GM released "Customer Satisfaction Program 18125 Loss of Propulsion High Voltage Battery Without Notification" regarding *all* Bolt EVs, including 2017 models that had already received the software update released little more than a month earlier.

---

[22] https://static.nhtsa.gov/odi/tsbs/2016/MC-10111727-9999.pdf (last visited Feb. 24, 2021).
[23] https://static.oemdtc.com/Recall/MC-10135136-9999.pdf (last visited Feb. 24, 2021).
[24] *See* April 9, 2018 Electrical System complaint at
https://www.nhtsa.gov/vehicle/2017/CHEVROLET/BOLT (last visited Feb. 24, 2021).

The May notice disclosed that "[c]ertain 2017-2018 model year Bolt EV vehicles may have a condition where the software will not detect the difference in the state of charge between the cell groups of the battery and over predict the indicated battery range. The current software may not provide sufficient warning prior to a battery cell low range condition, which may result in a loss of propulsion." GM explained that all Bolt EVs needed the software update to "increase[] the accuracy of the range estimation" and "provid[e] more warning at low states of charge."[25] GM updated its service procedure for this problem in August 2018.[26]

40.    In 2019, Tim Grewe, GM's chief engineer of electric propulsion systems, publicly acknowledged that LG Chem's manufacturing practices had caused Battery issues, including "reduced range and early capacity fade" in some Bolt EVs.[27]

41.    By 2020, GM was receiving complaints about fires stemming from the Battery pack, which prompted GM to initiate an internal investigation spanning from August to November of 2020.

42.    Despite its knowledge, GM did not notify Plaintiffs or other customers considering purchasing Class Vehicles of the Battery problems, the associated hazards, or GM's internal investigation.

43.    GM did not initiate its recall until after several fires occurred in Class Vehicles. Upon information and belief, GM delayed the recall to avoid the financial ramifications of

---

[25] https://static.nhtsa.gov/odi/tsbs/2018/MC-10143682-9999.pdf; Eric Loveday, *UPDATE – Possible Chevy Bolt Battery Cell Failure Prompts GM Statement / Recall*, INSIDE EVs (May 11, 2018), https://insideevs.com/news/337521/update-possible-chevy-bolt-battery-cell-failure-prompts-gm-statement-recall/ (last visited Feb. 24, 2021).
[26] https://static.nhtsa.gov/odi/tsbs/2018/MC-10145176-9999.pdf (last visited Feb. 24, 2021).
[27] *See* Bradley Berman, *My Chevy Bolt Is On Third Battery Pack: Here's Why*, INSIDEEVs (Feb. 6, 2019), https://insideevs.com/news/342671/my-chevy-bolt-is-on-third-battery-pack-heres-why/ (last visited Feb. 24, 2021).

acknowledging that Class Vehicles and their Batteries have manufacturing and design defects that render them incapable of safely providing customers with GM's advertised 238-mile driving range.

44.    GM actively concealed the fact that its representations regarding the Class Vehicle's Battery range were false in that the stated range could be achieved only through unreasonable usage of the battery at maximum capacity, which increases the risk of fire even when Class Vehicles are not in operation. GM withheld the fact that the existence of the Battery Defect would diminish Bolt drivers' usage of the Class Vehicles and depreciate the Class Vehicles' intrinsic and resale value.

45.    GM publicly announced the Battery Defect in the form of a recall in November 2020. GM Recall number N202311730 revealed, in pertinent part, that "General Motors has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles," that Bolts with "high voltage batteries produced at LG Chem's Ochang, Korea facility . . . may pose a risk of fire when charged to full, or very close to full, capacity" and that "GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk."[28]

---

[28] https://static.nhtsa.gov/odi/rcl/2020/RCSB-20V701-2489.pdf (last visited Feb. 24, 2021).

| GM Recall #: | NHTSA # | Date Issued: |
|---|---|---|
| N202311730 | 20V701 | Nov 13, 2020 |

**Recall Title:**

High Voltage Battery May Melt or Burn

**Recall Description:**

General Motors has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles. A select number of these vehicles were built with high voltage batteries produced at LG Chem's Ochang, Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity. While our investigation into this condition continues, GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk.

**Safety Risk Description:**

If the batteries in select vehicles within this population are charged to full capacity, or very close to full capacity, the batteries may pose a risk of fire.

**Repair Description:**

As an interim remedy, dealers will reprogram the hybrid propulsion control module 2 (HPCM2) to limit full charge to 90%.

**Customer Action:**

For more information, customers can visit www.chevy.com/boltevrecall or contact the Chevrolet EV Concierge 1-833-EVCHEVY or their preferred dealer.

---

**Recall Status:** INCOMPLETE

46.     GM mailed recall notices to Bolt owners and lessees in November 2020.  Below is a copy of a follow-up notice received by Plaintiffs.

COMPLAINT                                    15



47.     Instead of conducting a full recall to completely replace the defective Battery, GM is providing only an unsuitable temporary remedy of reprogramming the car's software so that drivers cannot fully charge their Class Vehicles, and therefore cannot take advantage of the EPA-estimated 238-mile range that GM promised them.

48.     The  reduced range produced by the software change increases the "range anxiety" that many EV drivers already have – the fear that their vehicle will not have sufficient battery

COMPLAINT                                    16

capacity to safely get them from point A to point B.[29] The software change also requires Plaintiffs and Class Members to spend more time charging their Bolt EVs, and imposes additional expense and inconvenience for maintenance and potentially for using other vehicles to reach destinations that would be accessible if the Bolt' range had not been significantly reduced.

49.    Accordingly, Bolt owners and lessees have been deprived of the benefit of the bargain they made when they purchased or leased their Bolts.

50.    While "GM said it understands owners could be upset about their cars not being fully functional", it will only "address complaints on a case-by-case basis."[30] Plaintiffs are not aware of GM having addressed owner complaints other than by recommending limiting the Battery's charging capacity.

51.    Upon information and belief, GM has not agreed to replace the defective Batteries or provide any other remedial measures that will provide Plaintiffs and Class Members with a permanent remedy for the Battery Defect and restore the EPA-estimated driving range of 238 miles on a full charge.

52.    GM's failure to properly address the known Battery Defect has harmed Plaintiffs and the Class Members.

**D.    Plaintiffs' Experiences with the Chevrolet Bolt**

53.    Plaintiffs' experiences with their Class Vehicle are consistent with those of countless other Chevrolet Bolt owners and lessees.

---

[29] *See* Allen Brooks, *EV "Range Anxiety": Real World Issues*, MASTERRESOURCE (July 10, 2017), https://www.masterresource.org/electric-vehicles/ev-batteries/ (last visited Feb. 24, 2021).
[30] Tom Krisher, *GM recalling nearly 69K Bolt electric cars due to fire risk,* ABC News (Nov. 13, 2020), https://abcnews.go.com/Technology/wireStory/gm-recalling-69k-bolt-electric-cars-due-fire-74194714 (last visited Feb. 24, 2021).

COMPLAINT                              17

54.     On or about November 27, 2018, Plaintiffs Carr and Wyers purchased a new 2019 Chevrolet Bolt from an authorized GM dealership in Beaverton, Oregon.

55.     Plaintiffs Carr and Wyers purchased their Chevrolet Bolt for personal and household use. It is their only vehicle.

56.     Plaintiffs Carr and Wyers decided to purchase the Chevrolet Bolt after seeing, hearing, and considering GM's representations about the vehicle, including the reported 238-mile range. They had considered buying another all-electric vehicle, the Nissan Leaf, but bought the Bolt because of its greater range.

57.     Plaintiffs Carr and Wyers received GM's recall notice in November 2020. Their dealer performed the software change on January 19, 2021.

58.     The required software change dramatically reduced the Battery capacity and the range of Plaintiffs' vehicle. After "fully charging" the Battery at a DC fast charge station, the charger's display stated that the Battery actually was charged to only 84% capacity (not the 90% indicated in GM's recall notices and press releases). And after "fully" charging the Battery to its new 84% capacity, the Vehicle's dashboard display estimated a driving range of only 126 miles – little more than *half* of the EPA estimated range of 238 miles that Plaintiffs expected when they purchased their Bolt.

59.     "Using the heat and air conditioning systems [in the Bolt] decreases the energy available for electric driving" (Owner's Manual, 2019 Bolt, p. 30) and so decreases the Bolt's range. The software patch installed on Plaintiffs' vehicle exacerbates these reductions in vehicle range, further limiting the trips that Plaintiffs can take in cold or hot weather without interrupting their journey to re-charge the Battery.

60.     Plaintiffs Carr and Wyers purchased the Bolt because they believed it offered the ability to travel to a number of out-of-town locations within Oregon that they visit on a regular basis on a single charge. They also believed it would allow them to travel to destinations in Washington State with at most one stop each way to "top off" the battery. The reduced range prevents them from taking many of these trips in the way they had planned. They now have to interrupt their travels to find and use charging stations or rent a vehicle. Renting a vehicle with a conventional engine, however, causes the environmental harms that Plaintiffs wanted to avoid in purchasing an EV.

61.     When Plaintiffs Carr and Wyers purchased their Chevrolet Bolt, they were not aware of the Battery Defect, or that to prevent a battery fire they would have to greatly reduce their vehicle's Battery capacity and their range.

62.     Had GM disclosed the Battery Defect, Plaintiffs Carr and Wyers would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

**E.  Numerous Other Chevrolet Bolt Owners and Lessees Have Complained of the Defect**

63.     Plaintiffs' experience is neither unique nor isolated. Defendant's defective Chevrolet Bolt has drawn the attention and ire of consumers around the country, with many angry customers taking to the Internet to voice their discontent over their vehicles and the response (or lack thereof) by GM.

64.     A small sample of the consumer complaints made to NHTSA about the Chevrolet Bolt Battery Defect issue are reproduced below:

- October 30, 2020 NHTSA ID NUMBER: 11372429

     Incident Date October 21, 2020

     IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND 3AM, WE WERE WOKEN UP BY SMOKE/FIRE ALARMS. WE STARTED RUNNING AROUND OUR HOME

COMPLAINT                                    19

TO IDENTIFY THE CAUSE OF THE ALARM. AFTER ABOUT
5 MINUTES OF SEARCHING INSIDE THE HOME AND
FINDING NOTHING, WE REALIZED THAT THERE WAS
SOME SMELL OF SMOKE COMING FROM THE GARAGE
AND WHEN THE MUDROOM DOOR WHICH LEADS TO
THE GARAGE WAS OPENED, WE FOUND THAT THE
CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF
SMOKE IN THE GARAGE. THE CHEVY BOLT WAS
PARKED/STATIONARY IN DOOR 3 SECTION OF THE
GARAGE AND OUR OTHER CAR WAS PARKED IN DOOR 1
SECTION OF THE GARAGE. THE DOOR 2 SECTION OF THE
GARAGE WAS EMPTY AT THE TIME OF THE INCIDENT.
WITH CHEVY BOLT ON FIRE, WE SAW THAT THE DOOR 3
SECTION OF THE GARAGE WAS ENGULFED IN FLAMES
AND FILLED WITH SMOKE. WE TRIED TO USE THE FIRE
EXTINGUISHER TO PUT-OFF [*sic*] THE FIRE BUT COULD
NOT CONTAIN THE SPREAD OF THE FIRE. THE CHEVY
BOLT WAS KEPT FOR CHARGING OVERNIGHT , AS HAS
BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN
FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS
SOON AS WE SAW THE GARAGE IN FLAMES AND FIRE
ENGINES ARRIVED WITHIN 15 MINUTES BUT THE FIRE
HAD SPREAD WIDELY AND CAUSED RAMPANT
DAMAGES TO THE ENTIRE GARAGE INCLUDING THE
OTHER CAR, BEDROOM ON THE TOP OF THE GARAGE IN
THE SECOND FLOOR AND THE BEDROOM ADJOINING
THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE
OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8
MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND
HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER
SECTION, EAT IN DINING, KITCHEN, FAMILY ROOM AND
FORMAL DINING ROOM. THE OTHER SECTIONS OF THE
HOME INCLUDING THE FOYER, OFFICE ROOM, SUN
ROOM AND ALL OF THE BEDROOMS UPSTAIRS WERE
QUICKLY FILLED BY SMOKE AND SOOT. THE HEAT
INSIDE THE HOME WAS SO MUCH THAT ONE CAN
LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP
FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY
ON THE SCENE AND HAVE BEEN DILIGENTLY
FOLLOWING UP ON THE INVESTIGATION.[31]

---

[31] https://www.nhtsa.gov/vehicle/2019/CHEVROLET/BOLT%2520EV/5%2520HB/FWD (last
visited Feb. 24, 2021).

COMPLAINT                          20

- October 16, 2020 NHTSA ID NUMBER: 11364692

  Incident Date October 16, 2020

  CHEVY BOLT FINISHED CHANGING [*sic*] AND THEN
  STARTED TO SMOKE FROM UNDER THE CAR. THE
  SOUND OF POPPING NOISES WERE HEARD AND THEN 10
  MINUTES LATER THE CAR WAS ENGULFED IN FLAMES.
  THE CARS BATTERY PACK STARTING [sic] POPPING
  THEN EXPLODED IN FLAMES.[32]

- July 17, 2020 NHTSA ID NUMBER: 11339878

  Incident Date July 4, 2020

  MY 2019 CHEVY BOLT WAS FULLY CHARGED AND
  DRIVEN FOR 12 MILES TO OUR DESTINATION, A
  TOWNHOUSE DEVELOPMENT WITH PRIVATE OUTDOOR
  OPEN PARKING. WE ARRIVED AROUND 7:30PM, PARKED
  IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR
  RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT
  HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT
  THE BACK OF THE CAR. I CALLED 911 AND
  FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN
  HOUR AFTER SMASHING THE REAR WINDOW TO GET
  ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN
  AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE
  RESTARTED. SMOLDERING WAS SO HOT IT PARTLY
  BURNED THE BACKSEAT. ONCE THE CAR WAS COOL
  ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT
  WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO
  SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS
  PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE
  SMOKE WAS SMALL AND STARTED ON THE AREA
  WHERE THE BACKSEAT WAS PREVIOUSLY LOCATED;
  MINUTES LATER THE SAME HEAVY SMOKE CAME OUT
  FAST FROM UNDERNEATH THE FRONT PASSENGER
  SIDE. THE POLICE WERE THERE TO WITNESS THAT
  INCIDENT. IT WAS AROUND MIDNIGHT THEN.

  3 SPONTANEOUS COMBUSTIONS IN 4 HOURS; DOOR
  CAMERA VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN

---

[32] *Id.*

COMPLAINT                    21

OUR ARRIVAL AND THE NEIGHBOR RINGING THE BELL; ONSTAR REPORTS DON'T SHOW ANYTHING ELECTRICALLY WRONG WITH THE CAR; NO ALTERATIONS HAD BEEN MADE TO IT; AND THE DASHBOARD DIDN'T SHOW ANY WARNINGS DURING THAT ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE THE PROBLEM WAS A HIGH VOLTAGE BATTERY RUNAWAY THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S WARRANTY, THEY REFUSE TO INVESTIGATE BECAUSE WE CALLED OUR INSURANCE FIRST INSTEAD OF GM (PER GM'S PRODUCT ASSISTANCE CLAIM TEAM). THE CAR IS CURRENTLY AT AIIA AND GM COULD GO INVESTIGATE. BUT THEY WON'T. HOW MANY OTHER BOLTS ARE SPONTANEOUSLY COMBUSTING AND PEOPLE GETTING HURT? HOW MANY WILL IT TAKE FOR GM TO CARE? THIS CAR'S DAMAGE LOOKS SIMILAR TO MINE[33]

## F. GM Sold and Continues to Sell Class Vehicles with Knowledge of the Battery Defect

65.     GM marketed, distributed, and sold Chevrolet Bolt vehicles throughout the United States, including in the State of Oregon.

66.     GM knew or should have known that the Class Vehicles were being advertised and sold with false and misleading representations regarding the range of the Class Vehicles and without disclosing the risk of fire posed by the defective Batteries. Despite this knowledge, GM has failed to compensate owners and lessees of the Class Vehicles. Instead, GM has implemented a temporary software change that reduces the Battery capacity by at least 10%, thereby reducing driving range and significantly reducing the Bolt's functionality.

67.     Due to the Battery Defect, the Chevrolet Bolt is  defective and is not fit for its intended purpose.

---

[33] *Id.*

68.     As a result of GM's unfair, deceptive and/or fraudulent business practices, Class Members have been deprived of the benefit of their bargain, lost use of their Class Vehicles for extended periods of time, been exposed to dangerous conditions, and have incurred lost time and out-of-pocket costs. Class Vehicles also have diminished value due to the Battery Defect.

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

69.     Prior to the recall, Plaintiffs and Class Members did not discover, and could not have discovered through reasonable diligence, that the Class Vehicles had the Battery Defect or that they soon would lose 10% or more of the Bolt's range. The only means for Plaintiffs and Class Members to make this discovery was through notice by Defendant -- or by their own Bolt catching fire.

70.     Accordingly, the tolling doctrine applies and any otherwise-applicable statutes of limitation have been tolled under the discovery rule. Additionally, all applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment.

71.     Further, GM is estopped from relying on any statutes of limitation in defending this action because despite GM's continuous duty to disclose to Plaintiffs and Class Members the character, quality, and nature of the Class Vehicles' Battery and range, GM knowingly concealed the Battery Defect from Bolt owners and lessees.

## CLASS AVERMENTS

72.     Plaintiffs bring this action on their own behalf, and on behalf of the following Nationwide Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> **All purchasers and lessees of model year 2017 through 2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the United States for end use and not for resale.**

73.    Plaintiffs bring this action on their own behalf, and on behalf of the following Oregon Subclass pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> **All purchasers and lessees of model year 2017 through 2019**
> **Chevrolet Bolt vehicles who purchased or leased their vehicle**
> **in the State of Oregon for end use and not for resale.**

74.    Together, the Nationwide Class and the Oregon Subclass shall be collectively referred to herein as the "Class."

75.    Excluded from the Class are: Defendant, its affiliates, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest; Defendant's current and former employees, officers and directors; the Judge(s) and/or Magistrate(s) assigned to this case; any person who properly obtains exclusion from the Class; any person whose claims have been finally adjudicated on the merits or otherwise released; and the parties' counsel in this litigation. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

76.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number of individual Class Members is unknown at this time, GM is reported to have sold more than 58,000 Bolts in the United States from late 2016 through 2019.[34]  Plaintiffs believe, and on that basis aver, that the Class numbers in the tens of thousands.

77.    **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over

---

[34] *See* https://gmauthority.com/blog/gm/chevrolet/bolt-ev/chevrolet-bolt-ev-sales-numbers/ (last visited Feb. 24, 2021).

the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.      Whether GM engaged in the conduct alleged herein;

b.      Whether GM knew or should have known about the Battery Defect but failed to disclose it and its consequences to members of the proposed Class;

c.      When GM became aware of the Battery Defect;

d.      Whether GM knowingly concealed the Battery Defect;

e.      Whether a reasonable consumer would consider the Battery Defect or its consequences to be material;

f.      Whether GM's conduct alleged herein violates consumer protection statutes, false advertising laws, warranty laws, and other laws as asserted herein;

g.      Whether Plaintiffs and Class Members overpaid for their Class Vehicles in light of the Battery Defect;

h.      Whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of GM's conduct alleged herein, and if so, the amount or proper measure of those damages; and

i.      Whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

78.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all Class Members were injured in the same manner by Defendant's uniform course of conduct described herein. Plaintiffs and all Class Members have the same claims against Defendant relating to the conduct alleged herein, and the events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and all Class Members sustained

monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct in selling and failing to remedy defective Class Vehicles. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members. There are no defenses available to GM that are unique to Plaintiffs.

79.    **Adequacy:** Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation – including consumer fraud and automobile defect class action cases – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

80.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and all Class Members. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and expensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them by Defendant. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified

based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, *etc.*) Defendant maintains regarding its sales and leases of Class Vehicles.

81.     Defendant has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

<u>COUNT I</u>
**Common Law Fraud**
**(On behalf of the Nationwide Class or, alternatively, the Oregon Subclass)**

82.     Plaintiffs repeat and incorporate by reference the factual averments in the foregoing paragraphs.

83.     Plaintiffs bring this claim on their own behalf and on behalf of the Nationwide Class or, in the alternative, on behalf of the Oregon Subclass.

84.     GM's advertising campaigns, product descriptions, and other materials consistently touted the Class Vehicles' EPA-estimated 238-mile range and the benefits of the Bolt's Battery. Salespeople at authorized GM dealerships discuss the Bolt's EPA-estimated 238-mile range and provide promotional materials that emphasize the range. The window sticker displayed on Class Vehicles in dealer showrooms states that the car has an EPA-estimated range of 238 miles.

**a.   Fraud based on affirmative misrepresentations**

85.     Defendant affirmatively misrepresented to Plaintiffs and the Class in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the Battery was fully charged. Defendant knew these representations were false when made.

86.     The Class Vehicles purchased or leased by Plaintiffs and the Class were, in fact, defective, unsafe, and unreliable, because the vehicles' Batteries were susceptible to catching fire when fully charged or nearly fully charged.

87.     The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle, and in particular an electric vehicle. Defendant knew or recklessly disregarded that its representations were false, but intentionally made the false statements to sell vehicles.

88.     When purchasing Defendant's Class Vehicles, Plaintiffs did in fact rely on Defendant's affirmative assurance that its vehicles would safely and reliably travel the disclosed driving range.

89.     Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and the Battery Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. As a result, Plaintiffs and the other Class members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defects and all of the resultant problems.

### b.  Fraud based on material omissions

90.     GM's words and actions in promoting the Bolt's EPA estimated 238-mile range and encouraging customers to fully charge the Battery in Class Vehicles created a false impression about the safety and range of the Class Vehicles.

91.     GM's representations were, in effect, half-truths because the Battery Defect renders the Battery unsafe when fully, or nearly fully, charged, and the software change that makes the Battery safer also reduces its range to significantly less than 238 miles. GM did not disclose the risk of a fire, the need for a software change, or the Bolt's resulting reduced range to Plaintiffs or other Class Members.

92.     A reasonable consumer would have expected that the Chevy Bolt would not be defective and pose a serious safety risk and would have expected to be able to safely fully charge the vehicle to achieve the advertised EPA-estimated range. The facts not disclosed by Defendant to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles and how much to pay for the vehicle.

93.     Plaintiffs saw and heard GM's representations and half-truths about the Bolt's Battery and EPA-estimated 238-mile range. They relied on those representations and half-truths in deciding to purchase the Bolt. Among other things, Plaintiffs Carr and Wyers considered buying another all-electric vehicle, the Nissan Leaf, but bought the Bolt instead because of its greater range.

94.     Had Plaintiffs or the other Class Members known the whole truth about the Bolt's Battery Defect and reduced range, they would not have purchased the Bolt or would have paid less for it.

### c.   Fraudulent concealment

95.     GM concealed material facts from Plaintiffs and the Class. Even after receiving reports about fires in Bolt Batteries, GM did not tell customers about GM's investigation into those fires, about the Battery Defect, or about GM's intention to address the risk of fire by reducing the charging capacity of the Batteries by at least 10%, thus reducing the Bolt's range. Indeed, at least one Bolt Battery fire had already been reported to NHTSA when a GM engineer publicly stated that that GM had "engineered the battery system so that you can charge to 100% and maximize range."

COMPLAINT                                    29

96.     Defendant intentionally concealed the Battery Defect, or acted with reckless disregard for the truth, and denied Plaintiffs and the Class information that was highly relevant to their purchasing or leasing decisions.

97.     A reasonable consumer would have expected that the Chevy Bolt would not be defective and pose a serious safety risk and would have expected to be able to safely fully charge the vehicle to achieve the advertised EPA-estimated range. The facts Defendant concealed from Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles and how much to pay for the vehicle.

98.     The aforementioned concealment was material because if it had been disclosed, Plaintiffs and Class Members would not have bought or leased the Class Vehicle or would have bought or leased the vehicle at a substantially reduced price.

**d. Plaintiffs are entitled to actual and punitive damages**

99.     Plaintiffs and the Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

100.    Defendant's conduct was knowing, intentional, with malice, and demonstrated a complete lack of care and was in reckless disregard for the rights of Plaintiffs and the Class. Plaintiffs and the Class are therefore entitled to an award of punitive damages.

<u>**COUNT II**</u>
**Violation of the Oregon Unlawful Trade Practices Act**
**(Or. Rev. Stat. § 646.605 through 646.656)**
**(On Behalf of the Oregon Subclass)**

101.    Plaintiffs repeat and incorporate by reference the factual averments in the preceding paragraphs.

COMPLAINT                                    30

102.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Class.

103.    Defendant and Plaintiffs are "persons" under the Oregon Unlawful Trade Practices Act, ORS § 646.605(4).

104.    Plaintiffs purchased their Bolt primarily for personal, family or household purposes and thus their Class Vehicle is a "good" under ORS § 646.605(6)(a).

105.    GM is and was engaged in "trade" and "commerce" as defined by ORS § 646.605(8).

106.    ORS § 646.607, provides in relevant part that a "person engages in an unlawful trade practice if in the course of the person's business, vocation or occupation the person . . . [e]mploys any unconscionable tactic in connection with selling . . . goods or services."

107.    Defendant knew that the Class Vehicles' Batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

108.    Defendant employed unconscionable tactics in selling the Class Vehicles by not giving Plaintiffs and Class members sufficient notice or warning regarding the Battery Defect, intending that Plaintiffs and the Class rely upon GM's omissions when purchasing the Class Vehicles. Plaintiffs and Class Members were deceived by GM's concealment of the Battery Defect.

109.    Defendant also engaged in unlawful and deceptive practices in violation of ORS § 646.608 by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Class Vehicles (ORS § 646.608(b)); representing that the Class Vehicles have characteristics, uses, benefits, quantities and qualities that they do not have (ORS § 646.608(e)); representing that the Class Vehicles are of a particular standard, quality or grade when

they are of another (ORS § 646.608(g)); concurrently with tender or delivery of the Class Vehicles, failing to disclose known material defects or material nonconformities (ORS § 646.608(t)); and engaging in other unfair or deceptive conduct (ORS § 646.608(u)).

110.    Defendant also engaged in unlawful and deceptive practices in violation of ORS 646.607 and 646.608 when it failed to provide the full cost to repair the Class Vehicles and replace their defective Batteries after being notified of the Battery Defect.

111.    GM knew or should have known that its conduct was a violation of the Oregon Unfair Trade Practices Act, ORS § 646.605 - .656, and therefore its conduct was willful. ORS § 646.605(10).

112.    Plaintiffs and Class Members have suffered an ascertainable loss of money or property as a direct and proximate result of Defendant's willful use or employment of unlawful methods, acts or practices and so are entitled to recover actual damages or $200, whichever is greater, plus punitive damages, attorney's fees and costs, and appropriate equitable relief. ORS § 646.638(1).

113.    In addition, Plaintiffs and the Class are entitled to obtain injunctive relief and recover reasonable attorney fees for Defendant's violations of ORS § 646.608.

**COUNT III**
**Breach of Implied Warranty of Merchantability**
**Violation of Or. Rev. Stat. § 72.8020 *et seq.***
**(On Behalf of the Oregon Subclass)**

114.    Plaintiffs repeat and incorporate by reference the factual averments in the preceding paragraphs.

115.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass.

116.    The Class Vehicles are "consumer goods" as defined in ORS § 72.8010(1).

COMPLAINT                                  32

117.    Plaintiffs and Class Members are "buyers" and "retail buyers" as defined in ORS § 72.8010(2).

118.    GM is and was at all relevant times a "manufacturer" as defined in ORS § 72.8010(3) with respect to the Class Vehicles.

119.    Pursuant to ORS § 72.8020, GM impliedly warranted that the Class Vehicles and their Batteries are fit for the ordinary purposes for which they are used:  transporting the driver and passengers in reasonable safety during normal operation, without unduly endangering them or members of the public.

120.    By marketing, advertising, distributing, and selling Class Vehicles with the Battery Defect, Defendant breached the implied warranty that the Class Vehicles, including their Batteries, were merchantable and safe for use as personal transportation.

121.    The Battery Defect existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time they were sold or leased to Plaintiffs and the Class.

122.    Plaintiffs and the Oregon Subclass Members have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by GM's conduct or by operation of law in light of GM's unconscionable conduct.

123.    GM received timely notice regarding the Battery Defect but has failed and refused to offer an effective remedy.

124.    Plaintiffs and the Oregon Subclass Members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiffs and the Oregon Subclass Members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties.

COMPLAINT                                     33

The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

125.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Oregon Subclass Members suffered economic damage, including loss attributable to the diminished value of the Class Vehicles.

**COUNT IV**
**Breach of Express Warranty**
**(On Behalf of the Nationwide Class, or in the alternative the Oregon Subclass)**

126.   Plaintiffs repeat and incorporate by reference the factual averments in the preceding paragraphs.

127.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, in the alternative, the Oregon Subclass.

128.   Plaintiffs and other Class Members formed a contract with Defendant at the time they purchased or leased their Class Vehicles. The terms of the contract include the promises, affirmations of fact, and express warranties made by Defendant.

129.   Among other things, Defendant promised its customers that GM was "committed to making sure you are completely satisfied with the new vehicle"[35] and would have an excellent ownership experience.[36]

---

[35] 2019 Bolt EV Owner's Manual, at 335, https://my.gm.ca/chevrolet/en/content/dam/gmownercenter/gmna/GMCC/dynamic/2019/chevrolet/Bolt/en/2019-chevrolet-bolt-ev-owners-manual-english.pdf (last visited Feb. 24, 2021); 2018 Bolt EV Owner's Manual, at 333, https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2018/Chevrolet/Bolt/2018-chevrolet-bolt-ev-owners-manual.pdf (last visited Feb. 24, 2021); 2017 Bolt EV Owner's Manual, at 324, https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2017/Chevrolet/BOLT%20EV/Owner's%20Manual.pdf (last visited Feb. 24, 2021).
[36] 2019 Limited Warranty and Owner Assistance Information ("2019 Limited Warranty Booklet") at 1,

130.    GM provided all purchasers and lessees of 2016 through 2019 model year Chevrolet vehicles with the following warranties:

a.    A "New Vehicle Limited Warranty" providing "Bumper-to-Bumper" coverage for the first 3 years or 36,000 miles; and

b.    A Powertrain Limited Warranty of 5 years/60,000 miles.[37]

131.    "For vehicles sold in the United States, in addition to the Bumper-to-Bumper Coverage described" in the prior paragraph, "Chevrolet "warrant[ed] certain components for Each Chevrolet . . . Bolt EV. . . for 8 years or 100,000 miles…against warrantable repairs to the specific electric propulsion components of the vehicle," which includes repair to and replacement of the high voltage "Propulsion Battery" at issue in this lawsuit.[38]

132.    Defendant also offers an optional extended new vehicle limited warranty.

133.    The Plaintiffs' and Class Members' Class Vehicles did not perform as promised due to the Battery Defect.

134.    The Class Vehicles were defective as herein alleged at the time they left Defendant's factories, and the vehicles reached Plaintiffs and Class Members without substantial change in the condition in which they were sold.

---

https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/19_CHEV_WM_.pdf (last visited Feb. 24, 2021); 2018 Limited Warranty and Owner Assistance Information ("2018 Limited Warranty Booklet") at 1, https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/2018-chevrolet-limited-warranty-and-owner-assistance-information.pdf (last visited Feb. 24, 2021).
[37] 2019 Limited Warranty Booklet at 2; 2018 Limited Warranty Booklet, at 2; *Important Information,* https://www.chevrolet.com/important-information (last visited Feb. 24, 2021).
[38] 2019 Limited Warranty Booklet at 13-14; 2018 Limited Warranty Booklet at 13-14; *Important Information,* https://www.chevrolet.com/important-information (last visited Feb. 24, 2021).

135.   Defendant has actual knowledge that it breached its express warranties to Plaintiffs and Class Members regarding the Class Vehicles.

136.   Defendant breached the terms of its express warranties by selling Class Vehicles with dangerous defects.

137.   Defendant breached the terms of its express warranties by not providing Class Vehicles with properly functioning Batteries.

138.   Plaintiffs sought assistance from Defendant for their Class Vehicle pursuant to the recall during the express warranty period. GM has not provided a permanent solution to the Battery Defect, and Class Vehicles have not been repaired and restored to the condition warranted.

139.   As the foreseeable and actual result of Defendant's breach of express warranties, Plaintiffs and the Class have been damaged in an amount that is the difference between the value of the Class Vehicles if they had possessed Batteries as warranted and had performed as represented, and the value of the Class Vehicles that Plaintiffs and the Class actually received.

<u>**COUNT V**</u>
**Unjust Enrichment**
**(On behalf of the Nationwide Class or in the alternative the Oregon Subclass)**
**(In the Alternative to Plaintiffs' Warranty Claims)**

140.   Plaintiffs repeat and incorporate by reference the factual averments contained in the preceding paragraphs.

141.   Plaintiffs bring this claim on behalf of themselves and the Class.

142.   Plaintiffs and Class Members have overpaid for their defective Class Vehicles in amounts that they would not have paid to purchase or lease the vehicles had they known of the Battery Defect.

143.    Defendant has been unjustly enriched by these overpayments, which were obtained by the conduct described herein. Equity militates against Defendant retaining these ill-gotten gains.

144.    Defendant should be required to relinquish the monies it obtained and disgorge its profits from sales of Class Vehicles as restitution to place Plaintiffs and Class Members in the position in which they would have been had Defendant not knowingly sold Class Vehicles with a concealed Battery Defect that potentially causes a vehicle fire and that has caused Plaintiffs and Class Members to experience reduced driving range.

**COUNT VI**
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301 *et seq.* ("MMWA")**
**(On behalf of the Nationwide Class)**

145.    Plaintiffs repeat and incorporate by reference the factual averments in the preceding paragraphs.

146.    Plaintiffs bring this claim on their own behalf and on behalf of the Nationwide Class.

147.    The Class Vehicles are a "consumer product" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

148.    Plaintiffs are "consumers" under the MMWA, 15 U.S.C. § 2301(3).

149.    Defendant is a "supplier" and a "warrantor" under the MMWA, 15 U.S.C. § 2301(4)-(5).

150.    Under 15 U.S.C. § 2301(d)(1), consumers have a cause of action when they are damaged by a warrantor's failure to comply with a written warranty.

151.    Defendant's 3-year/36,000 mile "bumper to bumper" new vehicle limited warranty is a "written warranty" under the MMWA. 15 U.S.C. § 2301(6).

152.    Defendant's 5-year/60,000 mile Powertrain Limited Warranty is a "written warranty" under the MMWA. 15 U.S.C. § 2301(6).

153.    Defendant's 8-year/100,000 mile electric vehicle component warranty is a "written warranty" under the MMWA. 15 U.S.C. § 2301(6).

154.    Defendants' representations that the Class Vehicles sold to Plaintiffs and other Class Members have "an EPA-estimated 238 miles" on "a full charge" and that Plaintiffs and Class Members can "top off your battery as much or as little as you like"[39] are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6).

155.    Through these written warranties, Defendant warranted to Plaintiffs and Class Members that the Class Vehicles were free from defects, were of merchantable quality, and were fit for their ordinary and represented use.

156.    Plaintiffs and Class Members relied on the existence and duration of these written warranties when deciding whether to purchase or lease the Class Vehicles.

157.    Defendant breached the warranties as described herein. Contrary to Defendant's representation, Plaintiffs and other Class Members were and continue to be subject to the Battery Defect and must either limit their battery charge to 90% or risk a car fire that could endanger lives and destroy other property.

158.    Defendant further breached its written warranties by:

---

[39] https://web.archive.org/web/20171011012928/http:/www.chevrolet.com/bolt-ev-electric-vehicle#charging;
https://web.archive.org/web/20190421140946/https://www.chevrolet.com/previous-year/bolt-ev-electric-car;
https://web.archive.org/web/20180929091633/https://www.chevrolet.com/electric/bolt-ev-electric-car?cmp=OLA_DISPLAY_20519044_211515933_411199255_77369262 (all last visited Feb. 24, 2021).

COMPLAINT                                38

a.    Selling and leasing Class Vehicles with a battery that was defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

b.    Refusing and/or failing to honor the warranties by repairing or replacing the Battery and thereby leaving the Class Vehicles with a capability less than that that was advertised.

159.    Defendant knew, or should have known, of the Battery Defect in the Class Vehicles.

160.    Defendant knew, or should have known, of its misrepresentations and omissions regarding the capabilities of the Class Vehicles yet proceeded with a coordinated advertising campaign through which Defendant promised that the Class Vehicles have "an EPA-estimated 238 miles" on "a full charge" and that Plaintiffs and Class Members can "top off your battery as much or as little as you like."

161.    Defendant has been given reasonable opportunity to cure its breaches of warranty. Defendant had actual knowledge and ample notice that the Battery in the Class Vehicles is and was defective yet failed to provide an adequate remedy.

162.    As a result of the Battery Defect, the Class Vehicles fail to perform in accordance with their ordinary and intended purposes and are unfit and unreasonably dangerous for ordinary use.

163.    As a direct and proximate result of Defendant's breach of written warranties, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

164.    The amount in controversy for purposes of Plaintiffs' individual claims exceeds $25. The amount in controversy in this action exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be adjudicated. 15 U.S.C. § 2310(d)(3).

165.    Plaintiffs also seek costs and expenses, including reasonable attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, hereby request that this Court enter an Order against Defendant providing the following:

A.    Certification of the proposed Class, appointment of Plaintiffs as representatives of the Class and the Oregon Subclass, and counsel of record as Class Counsel;

B.    Injunctive relief temporarily and permanently enjoining Defendant from continuing to engage in the unlawful conduct alleged herein;

C.    Payment to Plaintiffs and Class Members of all out-of-pocket expenses resulting from or arising from the Battery Defect alleged herein;

D.    An award of all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled (including, without limitation, the lost time value of money and any payments made to Chevrolet dealers to address the Battery Defect);

E.    An award of pre- and post-judgment interest on any amounts awarded;

F.    Any additional appropriate equitable, injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class Vehicles and to extend applicable warranties to a reasonable period of time, and to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Battery Defect;

G.    An award of reasonable attorneys' fees, expenses, and costs of suit; and

H.      All such other or further relief as the Court may find to be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:   February 26, 2021

*/s/ Gregory Kafoury*
Greg Kafoury, OSB No. 741663
Kafoury & McDougal
411 SW Second Ave., Suite 200,
Portland, OR 97204
(503) 224-2647
kafoury@kafourymcdougal.com

Roberta D. Liebenberg (*pro hac vice* motion
forthcoming)
Gerard A. Dever (*pro hac vice* motion forthcoming)
Mary L. Russell (*pro hac vice* motion forthcoming)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com
mrussell@finekaplan.com

*Attorneys for Plaintiffs and the Proposed Class*

COMPLAINT                                      41